S. D. COOLEY *et al.* V. R. C. GILLIAM, *as Administrator*.

No. 15,856.

### SYLLABUS BY THE COURT.

1. EVIDENCE—*Secondary—Refusal to Produce Original.* Where written agreements are in the hands of the non-resident president of a defendant corporation, and a notice to produce them was given and an order to produce them was made by the trial court, which was not obeyed, copies of such agreements may properly be received in evidence.

2. FRATERNAL BENEFIT SOCIETIES — *Liability of Successor to Holder of Benefit Certificate.* Where a fraternal order issues a benefit certificate which is treated by its successor, another benefit order, as though issued by such successor, and the holders thereof are in every respect also treated as members of the new association, such successor will, upon the death of the beneficiaries, be held liable to the same extent that the association issuing the certificate would have been liable had it continued in business.

3. TRUSTS AND TRUSTEES — *Limitation of Actions.* Ordinarily the period of time limited for the commencement of an action against a trustee does not begin until he repudiates the trust or denies his liability, and it should appear that the beneficiary had, or ought to have had, knowledge of such repudiation or denial before the statutory period begins to run.

4. ——— *Fund of Fraternal Insurance Order Impressed with a Trust.* A fraternal order approved proofs furnished upon the death of a benefit-certificate holder, made and collected an assessment for a fund to pay the same in full and ordered its secretary and treasurer to pay the claim, and he did pay a part thereof. The remainder of the amount so collected was intermingled with other funds, but having on hand money sufficient to complete the payment set it apart and reserved it in the hands of its secretary and treasurer for that purpose. Becoming embarrassed, the association entered into an agreement with another of like nature which thereby succeeded to its business, property and effects, to which successor the secretary and treasurer paid the fund so reserved, upon the express agreement and promise that such successor would apply the fund to the purpose for which it had been so reserved. This application was not made, the balance due upon the certificate has not been paid, and the association which issued it is insolvent. *Held,* that the fund so set apart and reserved was impressed with a trust for the payment of this claim, and

that the officer so parting with it and the company so receiving it are liable to the claimant for the amount due upon the certificate.

Error from Shawnee district court; ALSTON W. DANA, judge. Opinion filed June 5, 1909. Affirmed.

### STATEMENT.

THIS was an action upon a joint beneficiary certificate issued by the National Aid Association to William A. Gilliam and Maggie A. Gilliam, payable to the survivor upon an assessment to be made on the members of the association, for the sum of $2000 or so much as should be derived from the assessment. The action was commenced on January 10, 1903, by R. C. Gilliam, as the guardian of the minor children of Maggie A. Gilliam. He alleged that William A. Gilliam died on August 30, 1900, leaving Maggie A. Gilliam as beneficiary, who died in a short time thereafter without having collected the certificate, leaving the minors, her children, for whom the guardian acted; that due proofs of death had been made and $1100 paid on the certificate; that an agreement of consolidation had been entered into by the association with the Bankers' Union of the World, which had agreed to pay all claims of the association; that S. D. Cooley, secretary and treasurer of the association, and L. K. Lewis, its president, had so juggled with the books and made such false and fraudulent entries therein that the books did not show the real amount of money that came into their hands; that they collected large sums which had never been accounted for; that for the purpose of paying the claim upon the certificate an assessment had been made and the money paid in by the membership, which money they had paid out on other claims and thereby diverted from the purpose for which it was paid in. The prayer was that the money so paid into the hands of Cooley for the payment of this claim should be declared a trust fund and ordered paid into court to pay this claim.

S. D. Cooley, the Bankers' Union, and W. A. S. Bird, receiver of the National Aid Association, were made defendants.

Several amended petitions were filed. A second amended petition was filed August 15, 1903, which in February, 1904, was further amended by substituting R. C. Gilliam, administrator of the estate of Maggie A. Gilliam, as plaintiff in place of R. C. Gilliam, guardian. Thereupon S. D. Cooley, appearing specially, filed a motion to strike this second amended petition, as so amended, from the files, for the reason that no summons had been issued against him under that petition and that R. C. Gilliam, administrator, was not a party to the action. This motion was denied.

The Bankers' Union filed a demurrer to this second amended petition as amended on the ground that several causes of action were improperly joined therein— one against the National Aid Association and its receiver; one against Lewis and Cooley, its officers, for conversion; and another against the Bankers' Union. This demurrer was sustained and leave given to docket separate actions. On February 13, 1905, a judgment was duly rendered in the action against W. A. S. Bird, receiver of the National Aid Association, for the amount then due upon the certificate. The receiver has nothing with which to pay this judgment.

On March 22, 1905, the plaintiff filed a third amended petition, as administrator, against the same defendants except Bird, receiver, alleging the death of the two beneficiaries, his appointment as administrator, the making of proofs of death, that the claim had been proved and allowed and an assessment made upon the members therefor, of which due notice had been given, that such assessment had been paid in to the amount of $2000, and that $1100 thereof had been paid on the certificate. Averments were also made that the Bankers' Union was a fraternal insurance corporation, existing under the laws of Nebraska; that the National

Aid Association and the Bankers' Union had pretended to consolidate their two orders under one management; that Cooley and Lewis, as secretary and president of the association, had turned over to the union $5000 of the trust funds of the association, including the balance of the amount so paid in on assessments to pay this claim; and that the union had wrongfully received and still retains this fund, whereby it was diverted from the purpose for which it was paid in. The prayer was that judgment be rendered declaring this sum of money to be a trust fund for the payment of the plaintiff's claim, and that Cooley and Lewis and the Bankers' Union be ordered to pay into court an amount sufficient to satisfy the plaintiff's claim of $900 and interest, due on the certificate. To this third amended petition defendant Cooley filed a motion reciting the various motions and demurrers before referred to, and the rulings thereon, and asking that it be stricken from the files, which motion was denied. A demurrer was also filed upon the various statutory grounds, and it was overruled. Answers were filed by the Bankers' Union and Cooley, and the case was tried and special findings made by the court. The plaintiff was allowed to amend the prayer of the petition so as to claim judgment for $900 and interest against Cooley and the Bankers' Union.

While the averments of the petition and the several amended petitions differ somewhat in detail, the facts that the claim had been allowed, the assessments made and the money paid in therefor and transferred to the Bankers' Union were stated in each of them, and the prayer in each was that this fund be declared a trust fund and the defendants held liable accordingly. Findings of fact were made giving a complete history of the transactions alleged in the petition and showing that the plaintiff's averments were true. Conclusions of law were made to the effect that the fund had been unlawfully transferred to the union and that S. D.

Cooley and the union were liable as trustees, and judgment was rendered accordingly against them for the balance due on the certificate.

*Gleed, Hunt, Palmer & Gleed,* for, the plaintiffs in error; *J. W. Gleed,* and *J. L. Hunt,* of counsel.

*Frank Doster, D. H. Branaman,* and *W. E. Atchison,* for the defendant in error.

The opinion of the court was delivered by

BENSON, J.: The findings are sufficient to sustain the conclusions of law and the judgment. The defendants contend, however, that several of these findings are not supported by the evidence. Other questions will be first considered.

There was no error in denying the motion to strike the second amended petition from the files because the title of administrator had been substituted for that of guardian. (*Reed v. Cooper, adm'r.,* 30 Kan. 574; *Service v. Bank,* 62 Kan. 857.) The omission of a formal order of substitution was immaterial; the denial of the motion was an approval of the substitution.

Judgment having been taken against the receiver, only one cause of action remained; therefore the motion to strike the last amended petition from the files for failure to docket separate actions was also properly denied.

Error is also predicated upon the order overruling the demurrer to the last amended petition for misjoinder, upon the theory that the action against Cooley was for conversion and against the Bankers' Union for an equitable accounting, citing *Benson v. Battey,* 70 Kan. 288. It was held in that case that Battey, trustee of an express trust, and Hood, the recipient of the trust fund, might be sued together in one cause of action, although another defendant who secured none of the fund was not properly joined. The claim of mis-

Cooley v. Gilliam.

joinder can not be sustained. (*Holderman v. Hood,* 70 Kan. 267.)

The finding that proof of death was duly made is criticized because such proof was furnished by the guardian instead of the administrator. If the capacity in which the same individual made the proof is important the association did not so treat it, for it accepted the proof and made partial payment upon it.

A notice was served on the defendants, the Bankers' Union and Cooley, to produce the consolidation agreements hereinafter referred to. Failing to do so, the court ordered them to be so produced. This order was not obeyed. On the trial evidence was offered tending to show that they were in the hands of Spinney, president of the union, who was a non-resident. Thereupon the court admitted copies. This is alleged as error. In *McCormick v. Roberts,* 32 Kan. 68, it was held that oral evidence of the contents of a written document is not permissible unless it be lost, "or the plaintiff refuse to give to the defendant an inspection or copy thereof, upon demand, as provided for in section 368 of the code." (Page 73.) The ruling was not erroneous. (*Deitz v. Regnier,* 27 Kan. 94; *Insurance Co. v. State Bank,* 50 Kan. 427; 2 Wig. Ev. § 1213.)

The finding that the beneficiary certificate was issued by the National Aid Association is challenged because it appears that this association was not incorporated until some time after the certificate was issued. The allegation of the petition was that the association had issued the certificate, and a copy was attached. From this copy it appears that it was issued by the National Alliance Aid. The answers were unverified general denials. The issuance of the certificate was thus admitted; but it is said that the plaintiff, in presenting the certificate of incorporation in evidence together with the beneficiary certificate, proved that the National Aid Association never issued it. The explanation

of this is that the National Aid Association was the successor of the National Alliance Aid, and the officers of the latter continued as the officers of the new association. The Gilliams were treated as members of the new association, this outstanding certificate of the old association was treated as an obligation of the National Aid Association in every respect the same as though it had issued it, and the association should be held liable to the same extent.

The court found that the plaintiff had been appointed administrator of the estate of William A. Gilliam and Maggie A. Gilliam. The defendants insist that there was no allegation or proof that he was appointed administrator of the estate of William A. Gilliam. The fact is immaterial. The amount due upon the certificate was payable to the survivor. William A. Gilliam died. Before making the collection Mrs. Gilliam died. The claim then belonged to her estate.

Defendant Cooley claims the benefit of the two years' clause of the statute of limitation. The answer was a general denial and did not raise the question of the statute of limitations. (*Chellis v. Coble*, 37 Kan. 558.) The question was not raised in the district court except by demurrer to the petition and objection to the testimony under it. It is argued that when the amendment was made to the petition substituting the administrator for the guardian the effect was the same as if a new action had been commenced at that date—February, 1904; and as more than two years had then elapsed since the transfer of the fund to the Bankers' Union, which was October 27, 1901, the claim of the plaintiff was barred. The petition stated a good cause of action. It charged that both Cooley and the Bankers' Union were trustees of this fund, and prayed for judgment against them for the amount due on the certificate because of their refusal to pay it over. The abstract does not show when they refused to make such payment or when a demand was made therefor.

Cooley v. Gilliam.

If we treat the beginning of the action as a demand, two years had not elapsed at the time of the amendment. The only evidence of a demand noticed in the record is the testimony of a witness who called on Cooley for payment in November, 1902, and this was within the two years next preceding the amendment. Ordinarily the period of time limited for the commencement of an action against a trustee does not begin until he repudiates the trust or denies his liability, and it should appear that the beneficiary had, or ought to have had, knowledge of such repudiation or denial before the statutory period begins to run. (Wood, Lim., 3d ed., § 212.) If this defense had been raised by answer it is quite probable that the plaintiff could have shown the absence of Mr. Cooley from the state so as to toll the statute, as the evidence shows that he was a non-resident all the time.

It is contended that the finding that the aid association "was consolidated with and absorbed by the Bankers' Union" is not sustained by the evidence. The evidence shows that the officers of the association and the union entered into several agreements providing in substance that a combination of the two associations should be formed; that the officers and directors of the aid association should resign, and that their places should be filled by persons selected by the Bankers' Union; that the union should pay all claims for death losses against the association of which notice had been given prior to October 12, 1901, not exceeding $34,334; that the association should turn over to the combined management all furniture and supplies, and $1300 on deposit with the National Surety Company, but no other money; that the officers of the association should labor to secure the transfer of the management and the selection in their places of reliable persons selected by the union; and that such further consolidation should take place as in the opinion of the management

of the union would most thoroughly protect the interests of the members of the association, the union to assume and pay all lawful claims against the association. Other details were set out in the agreements, the object of which appears to have been to surrender and transfer the business of the association to the union and provide for the payment of claims against the association. Mr. Cooley testified as a reason for this action that it was believed that the combined management would be able to effect a complete consolidation and insure the full payment of all death claims. The argument is made that this was not a consolidation of the two orders. Whether it should be called a consolidation or absorption or merger or combination is not very material. The fact is that the Bankers' Union, through its officers, chosen as officers of the aid association in the manner stated, took complete possession of the assets and control of the business of the association. Several officers of the association agreed to work for the union to carry the combination into effect. One of them testified:

"We were to work for the Bankers' Union and transfer the membership of the National Aid Association to the Bankers' Union. In other words, we were to destroy the National Aid for the benefit of the Bankers' Union, just as quick as we could get the members to go into the Bankers' Union, and that was what I was doing. I went to Emporia and called my lodge there, and then I made a statement of the facts; told them of the financial condition of the National Aid, and that the Bankers' Union had agreed to take our members and protect them; and then went to Osage City and did the same thing. I went around to various places for the purpose of taking the members out of the National Aid and putting them into the Bankers' Union.

"The other deputies and Mr. Lewis [the president] were doing the same thing. The understanding was that so fast as we could write the outlying agencies to instruct them to take no more applications for the National Aid but take them for the Bankers' Union, and

if they were taken for the National Aid to send them in and I was to transfer them."

The testimony shows that these services were paid for by the union out of the funds reserved to pay this claim, and in this manner the absorption was accomplished. The receivership followed in less than three months, and nothing was found to pay this claim.

The court found that the money paid on the assessment for this claim had been intermingled with other funds before the transfer to the Bankers' Union, but that a part of it was included in the $3500 remaining on hand at that time. The defendants insist that the accounts show that it had all been used for other purposes. Whatever the fact may be about this, there was evidence to show, and the court found, that this $3500 was on hand in the bank and in the safe, reserved for this purpose, at the time of the transfer, and that it was passed over to the Bankers' Union with the distinct agreement that it should be so applied. It must be remembered that this was not done under the so-called consolidation agreements, for they provided that only the $1300 on deposit with the surety company should be so transferred; but it was done without authority, upon the promise to apply it to the purpose for which it had been reserved.

The claim that the books of the association show that it did not have this money on hand when the transfer was made only presents a conflict in the evidence, which was settled by the finding.

The vital question is whether this fund was impressed with a trust for the payment of the plaintiff's claim. When the change of management was effected the president of the union asked for this money. The medical director of the association, who was active in bringing about the combination and who signed the agreement, testified that Cooley brought Mr. Spinney, president of the union, to him and told him that

Spinney wanted this money (the $1500 in the safe and the $2000 on deposit.) The witness testified further:

"I had a conversation with E. C. Spinney about the Gilliam claim. Mr. Cooley came to me and said that Spinney wanted the money that we had reserved to pay this Gilliam claim, and I said, 'Don't let him have it.'

"Mr. Cooley said, 'Mr. Spinney wants this money'; we had received the September assessment to meet these five claims, aggregating $5000. I said I did not want him to have it. Cooley brought Mr. Spinney out and said he had agreed to pay these claims. I said, 'This is a trust fund and we are holding it for the purpose of paying these claims specifically, and I want to know before night that these claims are paid.' Spinney said he would certainly see that they were paid; that he would regard them as a trust fund. . . . I said finally, 'Now I will consent to that with the understanding right here that this money is to be used for no other purpose on earth but to pay these three claims.'

"And Spinney and Cooley all agreed to that, and Cooley told him he would go up the next day and turn the money over in the bank and would give him what money they had in the safe. . . . Cooley told me there was at least $3500 in cash in his possession in the bank. . . . In the bank and office they had around in the safe. . . . He said, 'We have got the money to pay these claims.' That is the exact expression."

Mr. Cooley testified that the by-laws provided that the president should approve the death proofs and order the payment of claims, and the president of the association, after stating that this was the custom, testified as follows:

"Some time in August I learned that the claim was not paid. R. C. Gilliam, the guardian of the children, came to the National Aid Association. I called Mr. Cooley into my office, and he said it had not been paid because he did not have the funds on hand, and he said we were about to levy the September assessment and would have the fund; and I instructed him to pay the whole claim out of the first moneys received. He said he would pay it."

Mr. Cooley further testified:

"The Bankers' Union of the World and E. C. Spinney agreed to assume and pay all obligations of the National Aid. . All money on hand in the bank and office, together with office fixtures and all of the assets of the association, were then passed to the new management of the association."

The defendants contend that the payment of the assessments made for this purpose did not create a trust in favor of this beneficiary, but were merely made to replenish the beneficiary fund out of which all similar claims should be paid (Gen. Stat. 1901, §§ 3568, 3569), and that this view. is sustained by the opinion of this court in *Reeves v. Supreme Lodge,* 65 Kan. 860, wherein it was held that the representatives of a member are sharers in the fund levied and not the owners of any specific portion of it for their particular and exclusive use. In that case the claimant asked for an order against the receiver of the insolvent lodge for the payment to him of the full amount received from assessments on his claim. Several other claims of the same nature were outstanding, and the fund applicable. to their payment was insufficient. The district court held that the claimant should only be allowed his *pro rata* share of this fund, and the judgment was affirmed in the opinion cited. The right of the plaintiff in that action was determined from an inspection of the by-laws. In this case the by-laws are not in evidence. Applying, however, the rule there stated—that the plaintiff is only entitled to share in the fund—the fact remains that the fund here is sufficient to pay the claim in full. There is no finding that other claims payable out of it were outstanding or that the amount was insufficient for that purpose, and the evidence already referred to shows that the officers of the association had set apart and reserved this money for the payment of this claim—a disposition fully understood and agreed to when the transfer was made. The order having

19—80 KAN.

been made by the president to pay the claim in full, and the money being on hand for that purpose, and passing into the hands of the Bankers' Union upon the condition that it should be so applied, it is not perceived how the rule announced in *Reeves v. Supreme Lodge, supra,* should defeat the plaintiff. If the $3500 was not impressed with a trust at the time it was paid in, it was by the officers of the association made a trust fund to pay this claim.

"But a formal or even a written agreement is not necessary to create a trust in money or personal estate. Any declaration, however informal, evincing the intention with sufficient clearness will have that effect. Such declarations stand on somewhat peculiar grounds. They are not to be regarded as admissions merely of some antecedent fact in relation to the subject, but are to be looked upon and received as constituting the very trust which they acknowledge. The doctrine of equity is that by their own force they impress the fund with a peculiar character, and hence they are receivable on the same grounds as a precise and formal agreement. A person in the legal possession of money or property, acknowledging a trust, becomes from that time a trustee, if the acknowledgment is founded on a valuable or meritorious consideration." (*Day v. Roth,* 18 N. Y. 448, 453.)

"No particular form of words is required to create a trust in another, or to make the party himself a trustee for the benefit of another. It is enough for the latter purpose if it be unequivocally declared in writing, or orally if the property be personal, that it is held in trust for the person named." (*Gerrish v. New Bedford Institution for Savings,* 128 Mass. 159, 161.)

(See, also, *Janes v. Falk,* 50 N. J. Eq. 468; 1 Perry, Trusts, 5th ed., § 86.)

A person may thus make himself a trustee. (*Williamson v. Yager, &c.,* 91 Ky. 282, and note following report in 34 Am. St. Rep. 189 *et seq.* reviewing cases.)

In *Harvey v. Wasson,* 74 Kan. 489, it was held that where the directors transferred the entire assets of the association to another similar association without first

paying a fixed liability, although there were sufficient funds on hand for that purpose, they were guilty of a breach of duty making them personally liable. The court said:

"Moulton's claim had become a fixed liability against the society when the directors parted with the assets, and there were funds on hand to pay it which should have been applied thereto. The fact that the directors acted in good faith and in the manner which in their judgment was for the best interests of all the members will not relieve them from liability to Moulton, whose loss appears to have resulted from their unauthorized conduct." (Page 492.)

It is argued that this authority does not apply because the plaintiff's claim had not been established by judgment, and that therefore there was no fixed liability to pay it. We do not understand that a liability must necessarily be fixed by judgment. Here the claim had been made, approved, an order given for its payment, a fund reserved expressly for such payment, and part of it paid. The liability was fixed, at least so far as these defendants were concerned, by their own acts and admissions.

Again, it is said that in the absence of the by-laws we can not say, as in *Harvey v. Wasson, supra,* that there was a particular fund applicable to the payment of this claim. We ought to presume that the by-laws authorized what the officers did, and that when they set apart this fund to pay the claim they were acting in accordance with such by-laws.

The material findings appear to have been supported by competent evidence and warrant the conclusions drawn. The defendants must be held liable within the principles decided in *Harvey v. Wasson, supra,* for wrongfully disposing of the trust fund to the plaintiff's loss.

The judgment is affirmed.